IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| PIEDMONT BROADCASTING CORPORATION, | ) ) Case No. 4:08CV00039 |
| Plaintiff, | ) ) ) **MEMORANDUM OPINION** |
| v. | ) ) ) By: Jackson L. Kiser |
| ACE AMERICAN INSURANCE COMPANY, | ) Senior United States District Judge ) ) |
| Defendant. | ) ) |

Before me are cross motions for summary judgment on behalf of Plaintiff Piedmont Broadcasting Corporation and Defendant Ace American Insurance Company. I heard oral argument on both motions on June 16, 2009, and both motions have been thoroughly briefed by the parties. This matter is now ripe for decision. For the reasons given below, I will **DENY** Plaintiff Piedmont Broadcasting Corporation's Motion for Summary Judgment and **GRANT** Defendant Ace American Insurance Company's Motion for Summary Judgment.

**I.    STATEMENT OF FACTS AND PROCEDURAL HISTORY**

Plaintiff Piedmont Broadcasting Corporation ("PBC") filed a Complaint in the Circuit Court for the City of Danville on September 23, 2008 seeking a declaratory judgment regarding whether or not insurance coverage exists for a certain discharge of diesel fuel under an insurance policy issued by Defendant Ace American Insurance Company ("Ace"). This case was removed to this Court by Defendant Ace on December 5, 2008. The parties have contemporaneously filed cross-motions for summary judgment which are currently before this Court. Also, in order to

1

narrow the issues before the Court, the parties have filed a Joint Stipulation of Facts.[1] (Docket No. 13.)

In late 1992 or early 1993, PBC installed a 2,000-gallon capacity fuel storage tank (the "big tank") at its radio station located at 710 Grove Street, Danville, Virginia. (Joint Stipulation of Facts # 4.) In 2000, PBC installed a new back-up power generator at the radio station. (Cole Dep. 15:3-6, Apr. 2, 2009.) Also in 2000, at the same time as the new generator was installed, PBC added a new 25-gallon fuel tank (the "day tank") at the radio station to improve the flow of fuel from the big tank to the new generator. (Joint Stipulation of Facts # 4.) The big tank is located entirely below the surface of the ground, and the smaller day tank is located entirely above the surface of the ground. (Joint Stipulation of Facts # 6.) The big tank is connected to the day tank by two lines, one which brought fuel from the big tank into the day tank and one which took fuel from the day tank back to the big tank. (Cole Dep. 31:15-32:1.) The day tank was in turn connected to the power generator by two lines, one which brought fuel from the day tank to the generator and one which took fuel from the generator back to the day tank. (Cole Dep. 32:2-4.) The transfer of fuel between the big tank and the day tank was directed by controls located in the day tank. When the level of fuel between the big tank and day tank was reduced to approximately twenty (20) gallons, additional fuel traveled from the big tank to the day tank to fill the day tank to its 25-gallon capacity. (Cole Dep. 24:1-24.) If the fuel in the day tank reached or exceeded its maximum capacity, the excess fuel traveled from the day tank back to the big tank. (Cole Dep. 31:21-32:1.) The flow of fuel from the day tank to the generator was controlled by a transfer switch which activated the generator, in turn pulling fuel from the day

---

[1] These motions are based in large part on agreed upon facts set out in the Joint Stipulation of Facts. The parties envisioned that the Court would only need a few facts, provided in the Joint Stipulation of Facts, and the insurance

tank. (Cole Dep. 12:2-12.) The generator itself had no capacity to hold or store fuel. (Cole Dep. 13:18-14:4.)

Prior to the installation of the new generator in 2000, the big tank operated without the assistance or presence of a separate day tank. (Cole Dep. 36:13-37:15.) However, because of the increased fuel demands of the new generator[2] and the gravity issues to overcome with the underground big tank, fuel was unable to travel from the big tank to the new generator without the assistance of a day tank. (*Id.*) Although it is possible for an underground tank to supply fuel to a power generator without the assistance of a day tank, it was not possible for this underground tank to supply fuel to this particular generator without the assistance of an aboveground day tank. (Cole Dep. 37:1-5.)

In 2005, PBC contacted Walter Hayes ("Hayes"), a Senior Vice President at Banker's Insurance, Moses, Hayes & Willeford in Danville, regarding PBC's insurance coverage needs with respect to potential liability associated with the storage tanks. (Hayes Aff. ¶ 3.) Hayes recommended an Ace "Tank Safe - Storage Tank Liability Insurance Policy" ("Tank Safe Policy") to PBC. Under the terms of the policy, coverage may be obtained for either an underground storage tank ("UST") or an aboveground storage tank ("AST"). A covered UST is defined in the Tank Safe Policy as "a petroleum product containing tank and associated piping and appurtenances connected thereto with more than 10% of its volume below ground . . . ." (Tank Safe – Storage Tank Liability Insurance Policy 3.) Hayes requested issuance of a Tank Safe Policy for PBC from Ace with coverage for a 2,000 gallon UST, as defined in the Ace Tank

---

policy itself in order to determine the legal issues raised in this case. Therefore, the parties did not engage in significant discovery in this matter.
[2] According the PBC's engineer John L. Cole, the original power generator, in place prior to 2000, probably required approximately 35% to 40% as much fuel as the new generator installed in 2000. (Cole Dep. 37:5-8.) The original generator in place prior to 2000 apparently operated without the assistance of a day tank. (*Id.*)

3

Safe policy. (Hayes Aff. ¶ 4.)

Ace issued the Tank Safe Policy to PBC for a 2,000 gallon capacity UST with coverage first beginning December 16, 2005 through December 16, 2006. (Hayes Aff. ¶ 4.) The Tank Safe Policy issued to PBC did not cover any aboveground storage tanks. Ace renewed the Tank Safe Policy in 2006 and again in 2007. (Hayes Aff. ¶ 5.) The 2007 renewal covered the relevant period of December 16, 2007 through December 16, 2008. (Joint Stipulation of Facts # 2.) There were no changes in the function or configuration of the big tank and the day tank from the initial policy period through the renewal periods. (Cole Dep. 33:17-34:5.) The terms of the Tank Safe Policy provide that Ace agreed to cover PBC for claims arising from a "storage tank incident," "corrective action costs," and "legal defense expense" as defined in the policy. (*See* Tank Safe – Storage Tank Liability Insurance Policy 1.)

On May 5, 2008, approximately fifty (50) gallons of diesel fuel was discharged at the PBC radio station. (Wimmer Aff. ¶ 5.) The discharge originated from the 25-gallon capacity day tank. (Joint Stipulation of Facts # 5.) PBC, through Hayes, notified Ace of the discharge in writing on May 5, 2008. (Hayes Aff. ¶ 6.) By letter dated May 28, 2008, Ace formally denied coverage to PBC under the policy. (*See* Hayes Aff. Ex. A.) Ace asserted that the day tank was not a covered UST because it was not listed on the UST schedule of the policy nor was more than 10% of its volume underground. (*See id.*) Hayes responded to Ace's letter with correspondence dated June 30, 2008 in which he conveyed his opinion that the discharge was covered under the Tank Safe Policy because the day tank is an appurtenance to the big tank. (*See* Hayes Aff. Ex. B.) Ace reaffirmed its denial of coverage to PBC for the discharge by letter dated September 22, 2008. (*See* Hayes Aff. Ex. D.) In that letter, Ace denied the day tank was an appurtenance to the big tank. As a result of the May 5, 2008 discharge, PBC has incurred

4

expenses relating to the investigation, assessment, and abatement of the discharge and replacement costs of the tanks. Furthermore, Dan River Properties LLC, the owner of real estate along the Dan River, and Abe Koplen Clothing, a business located in the Danville area, have placed PBC on notice of potential claims for damages as a result of the discharge. (Joint Stipulation of Facts # 7.)

## II.     STANDARD OF REVIEW

Summary judgment is appropriate when no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). A genuine issue of a material fact exists if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In making this determination, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813 (1994); *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1129 (4th Cir. 1987). Nevertheless, where the record taken as a whole cannot lead a rational trier of fact to find for the nonmoving party, no genuine issue exists for trial and summary judgment is appropriate; that is, the moving party is entitled to judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Where faced with cross-motions for summary judgment, I must consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). When considering each individual motion, the court must take care to resolve all factual disputes and any competing inferences in the light most favorable to the party opposing that motion. *See id.*

## III.    DISCUSSION

5

The purpose of summary judgment is to isolate, and then terminate, claims and defenses that are factually unsupported. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Cross-motions for summary judgment are examined under the usual Rule 56 standard where each cross-motion must be evaluated on its own merits, with the court viewing all facts and reasonable inferences in the light most favorable to the non-moving party. *See Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). When the parties stipulate to the facts, obviously no genuine dispute as to material facts then exists for a factfinder to resolve. I must then draw inferences from the stipulated facts, and resolve those inferences in the light most favorable to the non-moving party. This action is one for declaratory judgment, and I view the question before me as a purely legal issue which does not require further factual development or turn on any dispute over witness credibility.[3] Therefore, there is no reason for a full trial on the merits, as a trial would not reveal any additional data to justify continuing the time-consuming process of litigation in this matter.

The issue before me is whether the Tank Safe Policy issued by Ace covers the discharge of diesel fuel from the 25-gallon day tank that occurred on May 5, 2008. Specifically, the issue is whether the 25-gallon day tank is a covered storage tank under PBC's insurance policy. After considering the pleadings, depositions, affidavits and joint stipulation of facts, I find that the fuel discharge is not a covered occurrence under the policy because the fuel discharge came from an aboveground storage tank, specifically excluded from coverage under the insurance policy provided by Ace.

    A.    <u>Plaintiff PBC's Motion for Summary Judgment</u>

---

[3] Pursuant to the Joint Stipulation of Facts, the Tank Safe Policy should be construed according to the laws of the Commonwealth of Virginia. (Joint Stipulation of Facts # 3.) I note that this is contrary to the choice of law

6

Case 4:08-cv-00039-JLK-mfu   Document 26   Filed 07/16/09   Page 6 of 17   Pageid#: 213

In support for its Motion for Summary Judgment, Plaintiff PBC argues that the Tank Safe Policy unambiguously provides coverage to PBC for the discharge. The policy defines a "covered underground storage tank" as "a petroleum product containing tank *and associated piping and appurtenances connected thereto* with more than 10% of its volume below ground, if such tank is listed in the Schedule of Covered Underground Storage Tanks shown in Item 8 of the Declarations." (Tank Safe – Storage Tank Liability Insurance Policy 3) (emphasis added). The Tank Safe Policy, while defining many terms, fails to define either "piping" or "appurtenances." Plaintiff contends that the 25-gallon day tank constitutes an "appurtenance" within the meaning of the "covered underground storage tank" definition provided in the Tank Safe Policy.[4] Since the day tank is an appurtenance to the big tank under the policy, Plaintiff alleges that Ace owes coverage to PBC for the May 5, 2008 fuel discharge.

In circumstances where an insurance policy fails to define a term in the policy itself, it must be given its plain and ordinary meaning. *Spence-Parker v. Md. Ins. Group*, 937 F. Supp. 551, 556 (E.D. Va. 1996); *see State Farm Fire & Cas. Co. v. Walton*, 244 Va. 498, 502, 423 S.E.2d 188, 191 (1992). In determining the plain and ordinary meaning of an undefined term within a policy, courts have routinely looked to dictionary definitions of the term. *See Spence-Parker*, 937 F. Supp. at 556. "Appurtenance" is defined as "[s]omething that belongs or is attached to something else." *Black's Law Dictionary* 111 (8th ed. 2004). The Merriam-Webster Dictionary (2009) defines appurtenance as "a subordinate part or adjunct." The American Heritage Dictionary (4th ed. 2000) defines appurtenance as "something added to another, more important thing; an appendage." These varying definitions yield different results as applied to

---

provision contained in the policy itself.
[4] Although both Plaintiff PBC and Defendant Ace offered affidavits regarding the intent of the parties when the

7

the day tank and the big tank: the day tank was clearly attached to the big tank by pipes and served as a subordinate part of the big tank.  However, it is unclear as to whether the day tank constitutes an "appendage" or "belongs to" the big tank within the meaning of the commonplace definitions.

      Although the applicable federal and Virginia statues addressing storage of regulated substances do not contain a definition for an "appurtenance" to a storage tank, several other state laws do contain definitions of "appurtenances."  For example, the Minnesota Rules defines "appurtenance" with regard to storage containers as: "devices, such as piping, fittings, flanges, values, dispensers, and pumps used to distribute, meter, or control the flow of regulated substances to or from an underground storage tank."  Minn. R. 7150.0030.  The Washington Administrative Code defines the term as "all valves, pumps, fittings, pipes, hoses and metering devices which are connected to a storage container, or which are used to transfer a material into or out of such storage container."  Wash. Admin. Code 16-201-010.  In addition, the Environmental Protection Agency ("EPA") defines "tank appurtenance" as "the additional pieces of equipment necessary to bring the tank into service.  Examples of tank appurtenances include, but are not limited to: ladder and gaugers platform, shell manholes, inlet-outlet connections, drawoffs (condensate, water and product), gauge hatch, vent connections, and liquid gauges and alarms."  *See* Environmental Protection Agency Acronyms and Glossary of Terms Relating to Oil Pollution Prevention, http://www.epa.gov/region6/6sf/sfsites/oil/acryglos.htm.   PBC argues that since Ace failed to provide a definition for the word "appurtenance" in the Tank Safe Policy, the term should be given its plain an ordinary meaning.  However, the ordinary commonplace definitions of "appurtenance" fail to rise to the level to warrant a finding that the day tank is an

---

insurance policy was issued, I find that both affidavits are inadmissible in this matter.

8

appurtenance to the big tank.

I am persuaded that the items identified as appurtenances in other jurisdictions, such as piping, fittings, flanges, valves, dispensers, and pumps, cannot be considered independent fuel storage devices. This tank was added for the purpose of receiving and holding fuel and storing it for a period of time before sending it to the power generator. The day tank is an entirely separate diesel storage unit that fits the definition of an item not covered by the policy. Ace did not agree to insure the fuel delivery system for the generator; rather, it contracted to provide coverage for the 2000-gallon underground storage tank specifically identified in the policy.

Plaintiff also argues that in the event that the Court finds the plain ordinary meaning of the term "appurtenance" ambiguous, such ambiguity must be construed as providing coverage. Where an insurance policy fails to define a term and the plain and ordinary meaning of that term creates ambiguity due to varying definitions, parol evidence may be considered to establish the meaning of the language used. *Spence-Parker*, 937 F. Supp. at 556. Since there is little parol evidence before the Court regarding the circumstances under which this policy was procured, common rules of contract construction dictate an interpretation which grants coverage instead of denying coverage. "Where two interpretations equally fair may be made, the one which permits a greater indemnity will prevail because indemnity is the ultimate object of insurance." *Hill v. State Farm Mut. Auto. Ins. Co.*, 237 Va. 148, 153, 375 S.E.2d 727, 730 (1989). Therefore, even if Ace's failure to define the policy cannot be resolved by looking to the plain and ordinary meaning of the word, the ambiguity created regarding whether coverage exists must be resolved in favor of PBC. While I recognize PBC's argument regarding the potential ambiguity of the term "appurtenance," I disagree that this analysis applies in this matter.

Defendant argues that before the Court should consider whether the meaning of the term

9

"appurtenance" influences the outcome of this case, it must first consider the specific language contained in the policy itself. Defendant contends that under the explicit terms of the policy, coverage may be obtained for either an underground storage tank or an aboveground storage tank. The Tank Safe Policy in question specifically provides coverage for one underground storage tank and excludes all aboveground storage tanks. The day tank was located entirely above the surface of the ground and therefore meets the definition of an "aboveground storage tank" as defined by the policy. PBC acknowledges that the day tank is "an intermediate storage device" that stores fuel and would be classified as a fuel storage tank. (Cole Dep. 31:7.) Thus, Plaintiff does not dispute that the day tank was an aboveground storage tank, but argues that the day tank can be an aboveground storage tank and an appurtenance at the same time.

    I agree with Ace's assertion that the express language of the policy must be considered along with the plain and ordinary meaning of the term "appurtenance." It is clear from PBC's submissions that PBC does not claim that the Tank Safe Policy separately identifies the day tank as a covered storage tank. The Tank Safe - Storage Tank Liability Insurance Policy Declarations page has the words "Not Applicable" listed under the Item 9 Schedule of Covered Aboveground Storage Tanks. The UST Schedule accompanying the policy lists a single covered underground storage tank with a capacity of 2000 gallons. Thus, PBC is compelled to rely on the notion that the day tank is an appurtenance to the covered underground storage tank. I agree with the Defendant that the language in the contract, particularly in an action such as this, is relevant. The Tank Safe Policy defines a "covered aboveground storage tank" as "a stationary petroleum product containing tank, and associated piping and appurtenances connected thereto with less than 10% of its volume below ground, if such tank is listed in the Schedule of Covered Aboveground Storage Tanks shown in Item 9 of the Declaration." (Tank Safe – Storage Tank

10

Liability Insurance Policy 3.) It is clear that 25-gallon day tank meets this definition of a covered aboveground storage tank under the terms of the policy.[5] (Cole Dep. 19:12-14.) The fact that the day tank meets the definition of an aboveground storage tank indicates that the day tank could have been insured separately under the policy.

      I also disagree with the notion that there is a capacity limitation on the definition of an aboveground storage tank. The fact that the day tank was significantly smaller than the covered 2000-gallon big tank does not make it any less of an aboveground storage tank. Upon reviewing the language of the policy, as well as reasonable inferences from the policy itself, it is clear that the policy was intended to cover a single underground storage tank. No additional storage tanks capable of independently holding fuel are included in the UST Schedule along with the covered 2000-gallon underground storage tank. Therefore, I find that the day tank, located entirely above the surface of the ground is an "aboveground storage tank" as defined in the policy. It is therefore excluded from covered in the Tank Safe Policy provided to PBC for the single 2000-gallon underground tank.

      At oral argument, PBC stated that because the day tank's maximum capacity was 25 gallons, it follows that approximately half of the fifty (50) gallons of leaked fuel was pulled from the big tank. Thus, the day tank and big tank are entirely interdependent as to the supply of fuel to the power generator, highlighting the day tank as an accessory to the big tank's functionality. However, the fact remains that the day tank was an "intermediate storage device" that meets the definition of an aboveground storage tank. The undisputed source of the discharge in this case was the 25-gallon day tank. (Joint Stipulation of Facts # 5.) The fact that the day tank pumped fuel to and from the big tank does not make it an "appurtenance" within the meaning of the

---

[5] Indeed, the 25-gallon day tank was entirely above ground level. (See Cole Dep. 19:12-14.)

11

policy.[6] Based on the terms and language of the insurance policy itself, I will deny PBC's Motion for Summary Judgment.

    B.    <u>Defendant Ace's Motion for Summary Judgment</u>

Since I have concluded that Plaintiff's Motion for Summary Judgment will be denied, I must now consider Defendant's Motion for Summary Judgment under the same Rule 56 standard. Defendant Ace contends that the intent of the parties is clear from the face of the policy and the language is unambiguous. The court must look to the plain an ordinary meaning of undefined nontechnical terms and assign them a meaning consistent with the sense in which they are used in ordinary speech. *See Spence-Parker v. Md. Ins. Group*, 937 F. Supp. 551, 556 (E.D. Va. 1996). Thus, the Court is without authority to resort to extrinsic evidence in interpreting the meaning of the Tank Safe Policy.

According to Defendant Ace's Motion for Summary Judgment, PBC's argument amounts to the notion that the parties contracted for insurance for an entire "fuel delivery system," including the day tank and power generator. Defendant argues that the insurance is limited to the 2000-gallon big tank named in the policy. The day tank is a storage tank in that it is a vessel capable of holding diesel fuel, but is not covered because it is an aboveground storage tank with less than 10% of its volume below ground. It is also not listed on the Schedule of Covered Underground Storage Tanks. It is uncontested that the contents of the spill originated from the 25-gallon day tank, and not the insured underground storage tank. (Joint Stipulation of Facts # 5.) Thus, the diesel spill is not a covered discharge under the policy. The day tank, although connected by piping to the big tank, is a separate diesel storage unit that fits the definition of an item not

---

[6] Under PBC's line of reasoning, anything connected to the covered big tank could be considered an "appurtenance" and therefore fall within the parameters of the Tank Safe Policy.

12

covered by the policy. The parties did not agree to ensure a "fuel delivery system" since the policy limits coverage to the storage tanks identified in the various schedules endorsed in the policy. While I am sympathetic to the argument that the policy is not limited to the big tank itself, it is difficult to extend coverage to a separate storage device not defined in the policy. The appurtenance language in the underground storage tank definition is intended to cover devices such as piping and gauges that are subordinate parts of the covered tank itself.

     The day tank was added for the express purpose of receiving and holding fuel and storing it for a period of time before sending a portion to the nearby generator. The fact that the day tank and big tank are connected by supply lines does not render the day tank an appurtenance. If it did, then the generator would also be an appurtenance, which clearly it is not. PBC contends that an "appurtenance" includes anything that is attached to something else. Thus, all parts of Plaintiff's fuel delivery system are appurtenances to the covered big tank. Common examples of tank appurtenances include: a ladder and gaugers platform, shell manholes, inlet-outlet connections, drawoffs, gauge hatches, vent connections, and liquid gauges and alarms. *See* Environmental Protection Agency Acronyms and Glossary of Terms Relating to Oil Pollution Prevention, http://www.epa.gov/region6/6sf/sfsites/oil/acryglos.htm. This suggests that appurtenances do not include separate storage tanks designed to independently store fuel . . . especially where the device meets the policy definition of an aboveground storage tank.

     Where the plain an ordinary meaning of an undefined term is unambiguous, the Court may not consider anything other than the language used in the policy, and any contrary intent of the parties is inadmissible. In determining the plain, usual, ordinary and popular meaning of an undefined term in a policy or contract, courts have routinely looked to dictionary definitions. *See Spence-Parker*, 937 F. Supp. at 556. The term "appurtenance" is defined in various

13

dictionaries as follows: "Something that belongs or is attached to something else;" "a subordinate part or adjunct;" "accessory: an accompanying part or feature of something;" and "something added to another, more important thing; an appendage." *See Black's Law Dictionary* 111 (8th ed. 2004); *The Merriam-Webster Online Dictionary* (2009); *Encarta* 2008, *The American Heritage Dictionary* (4th ed. 2000).[7]

Under the policy terms, coverage may be obtained for either an underground storage tank or an aboveground storage tank. The policy issued to PBC provides coverage for one underground storage tank and excludes all aboveground storage tanks. The day tank is located entirely above the surface of the ground and is, therefore, excluded from covered under the policy as an uninsured aboveground storage tank. After reviewing the context and language contained therein, it is clear that the parties intended the policy to provide insurance for one storage tank, the 2,000-gallon big tank. It does not cover additional storage tanks that are capable of independently holding fuel.[8]

After reviewing the language and conditions of the Tank Policy itself, I find the Defendant's case most compelling. By assigning different definitions, the Tank Safe Policy makes a clear distinction between aboveground storage tanks and underground storage tanks. It begs the question as to why PBC did not suspect that the day tank, which undisputedly falls within the definition of a covered aboveground storage tank, might not be covered under the

---

[7] These definitions are cited in my prior analysis of PBC's Motion for Summary Judgment.
[8] Although the parties agree that the Court should consider the plain and ordinary meaning of the word "appurtenance," they disagree about the interpretation of the "appurtenance" definitions. Plaintiff's interpretation is that an appurtenance is something attached to something else. This broad definition would include everything attached to the UST, including the generator, which is attached through piping and the day tank. The key distinction between the day tank and other items connected to the big tank, such as valves and gauges, is that the day tank is capable of independently storing fuel.

14

Tank Safe Policy for the 2000-gallon underground storage tank.[9] Plaintiff bases its entire argument on the notion that the day tank is an "appurtenance" to the covered underground big tank. Thus, Plaintiff concedes that the only way the day tank falls within the confines of the Tank Safe Policy is if it qualifies as an appurtenance to the big tank. The discrepancy in the interpretation of the ordinary and plain meaning of the term "appurtenance" in and of itself constitutes a genuine issue of material fact when considering Plaintiff PBC's Motion for Summary Judgment.

Many of the items that commonly meet the definition of "appurtenances," such as gauges, valves and vents, do not have the ability to independently store fuel on their own. Indeed, if an appurtenance was defined as anything attached to a covered tank, the definition would include anything connected to the covered tank, including the generator in this case. The day tank specifically falls into the category of an uncovered aboveground storage tank, excluded from coverage under the policy. The Application Worksheet for PBC's Tank-Safe Policy states that it is for "Underground Storage Tanks Only" and that the coverage "is for underground tanks only, not to include above ground tanks." (Def.'s Mem. in Supp. of its Mot. for Summ. J. Ex. 1.) The plain language of the Tank Safe Policy and the accompanying Application Worksheet for the policy demonstrates that the policy was intended for UST's only, and aboveground storage tanks were excluded. Allowing the day tank to qualify as an appurtenance to the big tank would extend the policy's coverage well beyond the plain and ordinary meaning of the word "appurtenance" and construe Ace's Tank Safe Policy as covering everything connected or associated with the covered underground storage tank.

---

[9] At oral argument, Defendant Ace contended that PBC's insurance agent, Walter E. Hayes, should have revised the policy to include the 25-gallon aboveground storage tank. While I do not believe that the affidavits of Hayes or

15

Case 4:08-cv-00039-JLK-mfu   Document 26   Filed 07/16/09   Page 15 of 17   Pageid#: 222

The parties agree that the term "appurtenance" is undefined within the Ace Tank Safe Policy and the parties stipulate that the plain and ordinary meaning of the word "appurtenance" should apply in this case. Where the plain and ordinary meaning of an undefined term is unambiguous, the courts should not consider anything other than the language used in the policy, and any contrary intent of the parties is irrelevant. *See Globe Iron Constr. Co. v. First Nat'l Bank of Boston*, 205 Va. 841, 848, 140 S.E.2d 629, 633 (1965). In this case, many different definitions from a multitude of sources have been proffered by the parties for the term "appurtenance." While the term "appurtenance" is undefined in the policy, the policy does define the term "covered aboveground storage tank." The 25-gallon day tank clearly meets this definition. Thus, the explicit terms of the Tank Safe Policy contradict the plain and ordinary meanings of the term "appurtenance," even viewed in the light most favorable to the Plaintiff. I find that the plain and ordinary meaning of "appurtenance" extends to items such as pipes and gauges, not independent aboveground storage tanks separately defined in the policy. After considering all the affidavits, pleadings, depositions, and joint stipulation of facts, I find that a reasonable factfinder could not reach the conclusion that the May 5, 2008 fuel spill was covered under the Tank Safe Policy issued by Ace. Therefore, I will grant Defendant Ace's Motion for Summary Judgment.

## IV. CONCLUSION

For the reasons stated above, I will **DENY** Plaintiff Piedmont Broadcasting Corporation's Motion for Summary Judgment and **GRANT** Defendant Ace American Insurance Company's Motion for Summary Judgment in this case. An appropriate Order will be entered.

---

David Lau are admissible, I render no opinion as to the culpability of PBC's insurance agent.

The Clerk is directed to send a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

Entered this 16th day of July, 2009.

                                      s/Jackson L. Kiser
                                      Senior United States District Judge